UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ELECTRONICALLY FILED

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL ACTION NO. 3:19-CR-00208-RGJ |
| JOSEPH SAMIR ZAKHARI | DEFENDANT |

**DEFENDANT ZAKHARI'S MOTION FOR
REVIEW OF RELEASE ORDER
PURSUANT TO 18 U.S.C. § 3145(a)(2)**

The Magistrate Judge decided on November 1, 2019, to release Joseph Zakhari pending trial subject to several restrictive conditions, one of which called for Mr. Zakhari to abide by "24-hour-a-day lock-down at [his parents'] residence except for medical necessities and court appearances or other activities specifically approved by the court."  (R. 8, Order Setting Conditions of Release at pg. 4 ¶ 7(p)(iii), Page ID # 16; R37, Transcript of Detention Hr'g, pg 59, Page ID # 170.)  When he imposed this requirement of "home incarceration," the Magistrate Judge proceeded beyond the modestly less-restrictive option of "home detention" and opted for the severest possible measure of confinement short of outright imprisonment.

Mr. Zakhari asks the Court to review the relevant evidence *de novo* and reduce the existing home incarceration mandate to home detention.  18 U.S.C. § 3145(a)(2); *see United States v. Marcrum*, 953 F.Supp.2d 877, 880 (W.D. Tenn. 2013) (*de novo* standard).  If the Court considers this adjustment appropriate, Mr. Zakhari will be able – if his supervising probation officer so allows – to enter the back yard of his residence, and perhaps eventually to leave his home for exercise, religious services, job searching, and similar activities.  (*See* R. 8, Order at pg. 4 ¶ 7(p)(ii), Page ID # 16 (describing standard of "home detention").)

"The default position of the law," explained the Sixth Circuit, "is that a defendant should be released pending trial."  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  The goal in all cases is to find "the least restrictive … combination of conditions" that will "reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community…."  18 U.S.C. § 3142(c)(1)(B); *United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007).  To that end, the Bail Reform Act calls for the judicial officer to "consider four factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community."  *Vasilakos*, 508 F.3d at 410-411 (citing 18 U.S.C. § 3142(g)(1)-(4)).  The government must prove by a preponderance of the evidence

that the defendant constitutes a flight risk, and must show by clear and convincing evidence that he represents a danger to the community. *United States v. Perry*, 788 F.2d 100, 108 (3rd Cir. 1986); *United States v. Vortis*, 785 F.2d 327 (D.C. Cir. 1986). For persons charged with Mr. Zakhari's offense, the law adds a presumption favoring detention, § 3142(e)(3)(E), but the burden this places on the defendant "is not heavy": it is rebutted when the defendant "introduce[s] at least some evidence" that "he does not pose a danger to the community or a risk of flight." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

The government alleges that Mr. Zakhari came to the attention of law enforcement officers on October 6, 2019. (R. 1, Complaint, pg. 3 ¶ 4, Page ID # 3.) He was age 32, finishing medical school at the University of Louisville after having earned a Ph.D. a few years earlier. (R. 37, Tr. pp. 25, 33, Page ID # 136, 144.) He had never before had a brush with the criminal justice system. (*Id.* at pg. 15, Page ID # 126.) The prosecution contends that he was using a text-messaging application associated with the popular social media platform "KiK," and communicating under his own name, "jzakhari." (R. 1, Compl. pg. 3 ¶4, Page ID # 3; R. 37, Tr. pp. 5-8, 51, Page ID # 116-119, 162.) He had reached out to a KiK account ostensibly belonging to a female ("boredcrbgirl"), but was actually conversing with an "undercover persona" controlled by a state Attorney General investigator. (R. 1, Compl. pg. 3 ¶4,

Page ID # 3; R. 37, Tr. pp. 6-7, Page ID # 117-118.)  The conversation became "sexual"; the agent represented that his "undercover persona" was fifteen years old.  (R. 1, Compl. pg. 3 ¶4, Page ID # 3; R. 37, Tr. pp. 6, 19, Page ID # 117, 130.)  When Mr. Zakhari asked for photographs, the agent sent pictures of an adult female police officer who was working with the investigation. (R. 37, Tr. pp. 6-7, 22-23, Page ID # 117-118, 133-134.)  At one point, according to the prosecution's evidence, "jzakhari" asked "boredcrbgirl," "Send me a pic of you doing the peace sign," and a picture of the female police officer making the sign was immediately transmitted.  The government asserts that by the afternoon of October 7, Mr. Zakhari was using graphic language in his texts:

    jzakhari-        Do you fuck random guys?
    boredcrbgirl-  Nr
    boredcrbgirl-  I only been w 3
    jzakhari-        Oh gotcha
    jzakhari-        Should we fuck?
    boredcrbgirl-  Idk
    jzakhari-        Do you like giving head?
    boredcrbgirl-  Wdy like
    jzakhari-        I want you to ride me
    jzakhari-        I also wanna fuck your ass

(R. 1, Compl. pg. 3 ¶4, Page ID # 3.)  The prosecution asserts that, in addition to the coarse talk, Mr. Zakhari sent a "dick pic" image on October 7 and another one the following day.  (*Ibid.*)  The government says that, on October 8, Mr. Zakhari arranged to have an Uber driver pick up the "undercover persona" (who was now played in real life by the female police officer whose pictures had been sent previously) and bring her to his apartment building; when the female officer arrived at the site, Mr. Zakhari came out to meet her, and was arrested.  (*Id.* at pg. 4-5 ¶ 8, Page ID # 4-5.)  All of Mr. Zakhari's actions involved texting on his smart phone; he never physically left his residence, never tried to speak by telephone with the "undercover persona," never initiated a video conference or other sort of non-text-based communication – all of his actions required the use of a smart phone with access to the internet.

     Mr. Zakhari's phone was taken from him immediately; forensic testing by the government has produced no evidence of wrongdoing other than the alleged misconduct in the present case. All of Mr. Zakhari's electronic devices were removed from his apartment on October 8; they, too, contain no relevant evidence, a reality that has either been confirmed by government experts already, or will be confirmed by them as soon as they get around to examining the equipment.  (The seized devices were reportedly "in the queue for analysis" as of mid-February: *see* R. 30, U.S. Resp.

at pg. 5, Page ID # 86.) The proof thus demonstrates that if Mr. Zakhari has ever misused his smart phone or computer equipment in any fashion on any occasion, it was solely in connection with the events of October 6-8, 2019 – his electronic life history is otherwise a clean slate.

Mr. Zakhari's parents are professionals with doctorates – his father, a pharmacologist, is a scientific affairs administrator in private business, and was formerly a director of basic research for a division of the National Institutes of Health; his mother, a sociologist, is retired after a career as professor of criminology at American University. Mr. Zakhari's father came to Louisville from the family home in College Park, Maryland, to attend Mr. Zakhari's detention hearing, and he volunteered himself and his wife for the role of third-party custodians. (R. 37, Tr. pp. 29-34, Page ID # 140-145.) The elder Dr. Zakhari's testimony so impressed the Magistrate Judge that he later commented, "I don't know that I've ever seen this degree of family support," describing it as "extraordinary" and "very convincing." (*Id.* at pp. 55-56, Page ID # 166-167.)

The government conceded at the detention hearing that Mr. Zakhari posed no risk of flight sufficient to justify incarceration pending trial. (R. 37, Tr. pg. 37, Page ID # 148.) The probation officer's pretrial services report offered the view that Mr. Zakhari should not be detained; the report recommended a variety of

6

stringent limits, including custodianship by Mr. Zakhari's parents at their Maryland residence, but did not propose home incarceration. (*See id.* at pp. 25-27, Page ID # 136-138.)

The Magistrate Judge concluded that the presumption favoring detention had been rebutted. (R. 37, Tr. pg. 55, Page ID # 166.) Ultimately, he said, "[t]he only danger that I have been given any reason to believe might be at play here is … further access to the internet, perhaps up to and including the possibility of inappropriate contact with minors on the internet…." (*Id.* at pg. 57, Page ID # 168.)

As framed by the Magistrate Judge, and indeed as justified by the evidence, the question under the Bail Reform Act in this case rightly focuses on the "danger [of] further access to the internet": if there is proof that Mr. Zakhari poses any risk whatsoever, the evidence points exclusively to the risk that he might misuse electronic communications on the internet. That being the case, the Bail Reform Act directs the Court to identify "the *least restrictive* … combination of conditions" sufficient to control *that* specific risk. § 3142(c)(1)(B) (emphasis added). Section 3142 mandates a progressive approach to the issue of detention: courts begin with the least restrictive security option, and only if that option cannot "reasonably assure" the community's safety and the defendant's appearance at trial should a harsher alternative be considered. *United States v. Maull*, 773

F.2d 1479, 1481-1482 (8th Cir. 1985), *and United States v. Orta*, 760 F.2d 887, 890-891 (8th Cir. 1985).  In Mr. Zakhari's case, then, a condition as stringent as home incarceration, with its unending physical lockdown, cannot properly be imposed unless *all other lesser conditions, taken together*, cannot "reasonably assure" that the community will be protected from whatever risk he demonstrably represents.

Home incarceration mandates a level of confinement far in excess of what the circumstances warrant in our case.  Analysts for the Federal Judicial Center have observed that "[i]ncarceration at home is the most severe form of home confinement...."  Paul J. Hofer and Barbara S. Meierhoefer, *Home Confinement: An Evolving Sanction in the Federal Criminal Justice System*, pg. 6 (Fed. Judicial Ctr. 1987).[1]  "[T]he home substitutes for prison," they explain: "Offenders are to remain there at all times with very limited exceptions ... [and] are precluded from shopping, from working, or from having visitors outside prescribed hours.  In some cases offenders may not even be allowed to go outside into their yards."  *Ibid.*  (Mr. Zakhari is one such detainee.)  "[T]he difficulty of serving such a sentence is underestimated when the isolation is not taken into account," they note.  *Id.* at pg. 29.  "Remaining at home for long periods can be excruciatingly boring – a form of solitary

---

[1]    Available at https://www.fjc.gov/sites/default/files/2012/HmCnfine.pdf.

confinement." *Ibid.* And having a detainee home all day inevitably causes strain to other family members in the residence. *Ibid.*

Home detention, though less severe than home incarceration, is hardly an easygoing experience. The Court's standard order warns defendants that, while under home detention, they will be "restricted to [the] residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer…." (R. 8, Order, pg. 4 ¶ (7)(p)(*ii*).) "The offenders' freedom to go where they please is completely restricted," note the Federal Judicial Center specialists. *Home Confinement,* pg. 6. "Home detention, if strictly enforced, is more punishing than curfew and affords greater control over an offender's activities," they add. *Ibid.* And to the extent any measure of liberty for the defendant is possible on home detention, that latitude cannot be enjoyed without the supervising probation officer's prior approval: even a moment in the back yard would require the officer's permission, and even an accommodation as slight as that would vanish the instant Mr. Zakhari failed to honor any of the officer's instructions.

The existing condition of home incarceration is stricter than necessary to protect society; it does not belong among "the least restrictive … combination of conditions" appropriate to ensure the

9

community's security in the present case. Mr. Zakhari accordingly asks the Court to change his conditions of release so that he will be subject to "home detention" rather than the unnecessarily-restrictive mandates of "home incarceration."

Respectfully submitted,

*Michael R. Mazzoli*
Scott C. Cox
Michael R. Mazzoli
Attorneys for Defendant Zakhari
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MazzoliCMLaw@aol.com

## CERTIFICATE OF SERVICE

On April 10, 2020, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*
Scott C. Cox
Michael R. Mazzoli