UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**ELECTRONICALLY FILED**

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL ACTION NO. 3:19-CR-00208-RGJ |
| JOSEPH SAMIR ZAKHARI | DEFENDANT |

## DEFENDANT ZAKHARI'S BRIEF IN SUPPORT OF
## HIS MOTION TO SUPPRESS

Defendant Joseph Zakhari was arrested, his condominium searched without a warrant, and he was subjected to a custodial interrogation, all on the evening of October 8, 2019. As illuminated by testimony and exhibits provided in the evidentiary hearing conducted a few months ago (*see* Tr. of Suppression Hr'g, R. 60), the events of October 8 progressed through a series of constitutional pressure points: first, the moment of arrest, where officers wrestled Mr. Zakhari to the pavement, causing him anguish and physical injury that colored his subsequent interactions with them (*id.* pp. 32-37, Page ID # 437-442); second, a sweep through the entirety of Mr. Zakhari's home, justified only by the investigators' assumption that all residences contain a hidden enemy until proven otherwise (*see id.* at pp. 37-41, Page ID

# 443-447); and last, an interrogation in police custody, which proceeded without an express waiver by Mr. Zakhari of his rights to remain silent and to have the assistance of counsel.  (*See id.* at pp. 44-60, Page ID # 449-465.)  The government's legal discussion of the first two of these stages (*see* U.S. Brief, R. 70, pp. 5-13, Page ID # 529-538) accurately presents the rules of law applicable to the investigators' conduct in those stages, and the Court can measure the constitutionality of that conduct (and can well reach a different conclusion than the government urges) without the help of additional commentary here.  We will focus on the interrogation, and will demonstrate that it must be excluded in its entirety from the evidence at trial, because Mr. Zakhari invoked his right to counsel at the outset of the questioning, and his unambiguous request for an attorney's help was ignored.

\* \* \* \* \*

"An accused in custody, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him...."  *Smith v. Illinois*, 469 U.S. 91, 94-95 (1984) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1977)) (punctuation omitted).  Questioning cannot resume thereafter unless the accused "validly waives his earlier request for the assistance of counsel."  *Id.* at 95.

The moment that the accused asks to talk to an attorney, "*all* questioning must cease…." *Smith*, 469 U.S. at 98 (emphasis in original). This is a "bright-line prohibition," the Supreme Court has warned: if courts tolerate anything less than scrupulous observance of the rule, investigators will "wear down the accused" by "badgering or overreaching – explicit or subtle, deliberate or unintentional," and by so doing persuade the suspect "to incriminate himself notwithstanding his earlier request for counsel's assistance." *Ibid.* (punctuation omitted) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983)). This can transpire very easily without counsel present: "[b]y its very nature," observed the Sixth Circuit, "custodial police interrogation entails inherently compelling pressures that can induce a frighteningly high percentage of people to confess to crimes they never committed." *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2010) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 268 (2011)).

Courts make "two distinct inquiries" when assessing compliance with these rules. *Smith*, 469 U.S. at 95. "First, courts must determine whether the accused actually invoked his right to counsel." *Ibid.* "Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Ibid.*

3

### Mr. Zakhari unambiguously invoked his right to counsel.

The first inquiry - whether the accused actually invoked the right to counsel – tests the accused's words for clarity. This clarity test calls for courts to determine, as an objective matter, whether the accused made a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). The suspect, in other words, "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Ibid.* A statement that does not satisfy this standard – one that is "ambiguous or equivocal" and "fails to meet the requisite level of clarity," *id.* at 459 – is insufficient, standing alone, to require "the immediate cessation of questioning…." *Id.* at 460. Although not dispositive of the inquiry, if there is proof that the particular interrogating officer did, in fact, understand that the accused had asked for counsel, that evidence can help the court decide the objective question of what a reasonable officer would have understood under the circumstances. *See Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004).

Courts undertaking this inquiry may consider only a closely circumscribed range of circumstances when gauging the clarity of the accused's statement. The suspect's request for the help of an

attorney is measured according to the *circumstances immediately surrounding* the moment the accused made the statement. *Smith*, 369 U.S. at 98-99. If there is ambiguity, it must be attributable to circumstances *preceding* the request for counsel or *inherent in* the request itself. *Ibid.* It is irrelevant if the suspect, *after* asking for an attorney, continues answering police questions. *Ibid.* A suspect's request for counsel is tantamount to a declaration that he considers himself unable to stand up to the police by himself; subsequent conversation with the interrogators is little more than proof that the accused was right to fear that he could not bear up under the pressure without a lawyer's help. *See ibid.* It is "intolerable," the Supreme Court explained, to "us[e] an accused's subsequent responses to cast doubt on the adequacy of the initial request itself...." *Id.* at 98-99. "No authority, and no logic," warned the Court, "permits the interrogator to proceed on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99 (quoting 102 Ill. 2nd 365, 376 (1984) (Simon, J., dissenting)).

    Mr. Zakhari invoked his right to counsel in the first few minutes of his interrogation in the offices of the Crimes Against Children Unit on October 8. Detective Matt Hedden began the

session by emphasizing the high stakes riding on Mr. Zakhari's cooperation with the questioning:

> Detective Hedden (MH): [T]here's some things we need to talk about.
>
> Mr. Zakhari (JZ): Yes sir.
>
> MH: Um, you know, a lot of what determines … your future is gonna rest on the next … few hours and days, just how you make your decisions, Mr. Zakhari.
>
> JZ: Okay.
>
> MH: [A]nd it's important to me that you're informed about those decisions.

(Suppression Hr'g, U.S. Ex. 1, Video at 17:57:00 – 17:58:00; *id.*, Def. Ex. 3, tr. of CACU interview at pg. 2.)

The information that Detective Hedden gave Mr. Zakhari for his "decisions" consisted of the *Miranda* warnings:

> MH: You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to have attorney present during questioning. If you cannot afford an attorney but desire one the court will appoint one for you at no cost. You can stop the questioning at any time by refusing to answer further or by requesting to consult your attorney. Do you understand what I just told you?
>
> JZ: Yes sir.
>
> MH: Okay. Um, like I said, there's a lot we need to talk about. Do you want to talk with me right now? You're not under obligation. If you get to some point where you say "I don't want to do it anymore" you can stop.

>           I'm … not gonna [hold] that against you anyway, okay?
>           And neither will a court.
>
> JZ:     Yes sir.

(*Id.*, U.S. Ex. 1, Video at 17:58:00; Def. Ex. 3, CACU interview at pg. 2.) Detective Hedden thus identified two methods for Mr. Zakhari to communicate his desire to stop the questioning: "refus[e] to answer further," or "request[] to consult your attorney." Detective Hedden made it plain that a request to talk with someone who was *not* an attorney would *not* trigger the detective's guarantee to terminate the interrogation. Ask for an attorney, though, and the questioning will cease: precisely what the law commands.

Detective Hedden's next step was not to ask Mr. Zakhari for an explicit waiver of his rights, but to invite him to answer questions. Mr. Zakhari's response is revealing:

> MH:    Do you want to talk to me right now?
>
> JZ:     I don't know who to call, I don't know if I call my dad or my sister. Oh my god. I can answer some questions and then maybe call, I don't even know what to think any more, I - I -

(*Id.*, U.S. Ex. 1, Video at 17:58:00; Def. Ex. 3, CACU interview at pp. 2-3.) Thus Mr. Zakhari did not welcome the offer to submit himself to further questioning: his immediate response was to say instead that he wanted to talk to his father or sister.

Detective Hedden did not follow up on the matter of Mr. Zakhari calling a family member. There was nothing wrong in

7

that: the detective hadn't promised to stop the interrogation if Mr. Zakhari asked to speak with a family member. And so Detective Hedden forged ahead, embarking on an effort to ingratiate himself with his target and coax him into talking:

> MH: Yeah I understand, listen. It's been a big day, right?
>
> JZ: Yes sir.
>
> MH: And like I said I'm trying to help you get through this.
>
> JZ: Yes sir. Yes sir. (*Crying*)
>
> MH: But you gotta be honest with me.
>
> JZ: Yes sir.
>
> MH: And there's gonna be parts of this, I'm gonna ask you some stuff that's not gonna be pleasant, they're gonna be embarrassing. But it's just you and me talking right now, okay?
>
> JZ: Yes sir. Yes sir.
>
> MH: This room, you can tell this room is sound proof.
>
> JZ: Yes sir.
>
> MH: Alright. So, I just want you to be honest with me and candid, alright?
>
> JZ: Yes sir. Yes.
>
> MH: Let's start off with the simple stuff. Tell me your name.

(*Id.*, U.S. Ex. 1, Video at 17:59:00; Def. Ex. 3, CACU interview at pg. 3.) Mr. Zakhari did as he was asked: gave his name; spelled it; and gave his date of birth. (*Ibid.*) But he would not go further:

> MH: And how about your social security number?
>
> JZ: Can I call my dad?
>
> MH: Well you know, I don't have your phone and I can't give it to you right now.
>
> **JZ: But you said I can stop any time and call if I wanted to.**
>
> **MH: Yeah, well, is your dad an attorney?**
>
> **JZ: My sister's an attorney.**
>
> **MH: Do you want to call your sister?**
>
> **JZ: Yeah** - I mean-
>
> **MH: If you want to, yes, but that's gonna be the end of us talking.**
>
> JZ: Well -
>
> MH: And that's not my rule, that's just the way it is.

(*Id.*, U.S. Ex. 1, Video at 18:00:00-18:01:00; Def. Ex. 3, CACU interview at pg. 4 (emphasis added).)

*Mr. Zakhari told Detective Hedden that he wanted to call an attorney.* "My sister's an attorney – Do you want to call her? – Yes." Detective Hedden had plainly stated the terms at the beginning of the session: "request[] to consult your attorney" and "the questioning will stop." Proof that Mr. Zakhari clearly expressed his wish to speak with a lawyer can be seen in the fact that Detective Hedden instantly warned him that *a call to his sister would "be the end of us talking."* The fact that the attorney happened to be Mr. Zakhari's sister does not diminish in the least

9

the content or clarity of his request for counsel. *"My sister's an attorney – Do you want to call her? – Yes."* There was no ambiguity in Mr. Zakhari's request, nor any puzzlement on Detective Hedden's part; Mr. Zakhari's statement was one that "reasonably [can] be construed to be an expression of a desire for the assistance of an attorney," and it was of sufficient clarity that Detective Hedden himself understood, as any "reasonable police officer in the circumstances would [have] underst[ood]," that the statement was indeed a request for an attorney. *See Davis*, 512 U.S. at 459-460.

The law therefore compelled Detective Hedden to cease all questioning. He did not; he persuaded Mr. Zakhari to keep talking. This continued conversation does not retrospectively cast any doubt on the clarity of Mr. Zakhari's initial request for counsel; it is irrelevant in that respect. The only possible significance of the ongoing interrogation is the chance that it contains evidence that Mr. Zakhari "validly waive[d] his earlier request for the assistance of counsel." *Smith*, 469 U.S. at 95. It does not: Mr. Zakhari did not relinquish his right to counsel, and as a matter of law he could not have done so, as explained next.

### Mr. Zakhari did not waive his right to counsel at any moment after he first asked to speak with an attorney.

As seen earlier, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith*, 469 U.S. at 95. The burden of proving this is on the government, and the prosecution must do so by a preponderance of the evidence. *Berghuis v. Thompkins*, 560 U.S. 370, 381, 383-384 (2010). The standard is severe, the Supreme Court has explained, because "additional safeguards are necessary when the accused asks for counsel...." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Therefore, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Ibid.* On the contrary, the government must show that "the accused himself initiate[d] further communication, exchanges, or conversations with the police." *Id.* at 484-485. And even if the suspect does this, the prosecution must prove still more: namely, that the accused-initiated "further communication" shows that "the purported waiver was knowing and intelligent ... under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the

11

dialogue with the authorities." *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (quoting *Edwards*, 451 U.S. at 486 n.9).

As it happened in our case, the "further communication" was initiated entirely by Detective Hedden. Seconds after Mr. Zakhari expressed his wish to consult an attorney, the detective returned all the more resolutely to the project of cajoling Mr. Zakhari into talking with him – he being someone who, after all, had only Mr. Zakhari's best interests at heart:

> MH: I wanna, … my point today, you know, look: it is what it is, right? You know, my point today is to find out why. You know there's two types of people that do what you did.
>
> JZ: Yes sir.
>
> MH: There's the guys that are, you know…, what the media would portray as a monster. Okay?
>
> JZ: Yeah.
>
> MH: There's the guys that had the van and the candy that hang out around playgrounds, okay.
>
> JZ: Oh my god. Yeah.
>
> MH: I don't think that's you.
>
> JZ: No.
>
> MH: Okay?
>
> JZ: God, no.
>
> MH: I'm trying to understand why Joe did this today, … what in your life contributed to you wanting to do this today.

12

JZ: Yes sir.

MH: That's what I'm trying to understand.

JZ: I can tell you that.

MH: Okay.

JZ: I - I've just been lonely, and I didn't know what to do, so I got on these stupid apps and, and one thing led to another, I don't even remember how I got in contact with this person, and I don't know why I didn't stop. I just had no one to talk to so I think I just went with it, and that was a huge mistake because clearly ... it was inappropriate from the beginning and I don't know why I didn't stop.

MH: Talk about ... the apps ... - tell me about that.

(Suppression Hr'g, U.S. Ex. 1, Video at 18:01:00 – 18:02:30; *id.*, Def. Ex. 3, CACU interview at pp. 5-6.)

Mr. Zakhari initiated none of the preceding exchange. The communication consisted of Detective Hedden's unctuous monologue about his belief that Mr. Zakhari wasn't one of the evil ones; then there was Detective Hedden's question: "[W]hat in your life contributed to you wanting to do this today[,] ... [t]hat's what I'm trying to understand"; then Mr. Zakhari answered the question he was asked; then Detective Hedden launched into the interrogation proper: "Talk about the apps...." The ensuing fifteen minutes consisted of a question-and-answer session in which Mr. Zakhari made damaging admissions, over and over.

13

Not only is there no waiver of the right to counsel to be perceived in this ongoing interrogation, Mr. Zakhari ultimately felt compelled to *invoke his right to counsel again*:

MH: What's the - is your phone locked in there?

JZ: Sir, I would like my lawyer at this point. I don't think this is fair to, you know, put me through much more than this.

MH: You're under arrest, you understand that, right?

JZ: Yes sir. How do I, how do I contact my family or whatever?

MH: You get a phone call when you get to the jail.

JZ: What do you mean I get a phone call when I get - I can't - call them now?

MH: You're done talking to me.

JZ: I'm not done talking to you – I don't know what else you want me to say.

MH: [I]f you want to talk to your attorney you can't talk to me after that. I told you that at the beginning that once you asked to talk to your attorney –

(*Id.*, U.S. Ex. 1, Video at 18:17:30 – 18:19:00; *id.*, Def. Ex. 3, CACU interview at pg. 19.) This, the government's brief concedes, was a satisfactory invocation of the right to counsel (U.S. br., R. 70 pg. 18, Page ID # 542), but the effort was wasted on Detective Hedden: he kept Mr. Zakhari talking, pressing him for another twenty minutes or so, and along the way manipulating Mr. Zakhari into surrendering the passcode for his cellphone. (*See id.*, U.S.

14

Ex. 1, Video at 18:23:00-18:25:00, 18:37:00-18:38:30; *id.*, Def. Ex. 3, CACU interview at pp. 22-25, 27. *See also* Tr. of Suppression Hr'g, R. 60 pp. 61-65, Page ID # 466-470.)

In truth, Detective Hedden did not simply ignore Mr. Zakhari's reiterated request to talk to an attorney: he affirmatively disregarded the invocation, and repeatedly warned Mr. Zakhari of the consequences that *would* follow *if* Mr. Zakhari should ever actually ask to consult an attorney:

> MH:  So if you want to stop talking to me, I need you to say "I don't want to talk to you anymore, I want to talk to an attorney," cause … one of the rules we have to follow is **if somebody asks to talk to their attorney**, we can't ask 'em questions any more. We can't talk to them at all.
>
> JZ:  I see.
>
> MH:  Okay. So that's why when you say that I have to be done. If you want to talk to me after that you have to clearly tell me I still want to talk to you.
>
> * * *
>
> JZ:  Okay so, … how do I … contact a lawyer to, to talk to me?
>
> MH:  They'll give you a phone book down there [in the jail] and you can find one in the phone book.
>
> JZ:  No, no, that's not what I'm asking, to "call me back"; to get to talk to them directly, and them know where to come and discuss?
>
> MH:  Well when are you talking about, are you talking about right now?

15

> JZ: I mean, yeah -
>
> MH: **If you tell me right now you want to talk to an attorney** I'm not talking to you anymore and I'm taking you to jail [and] you can call an attorney from there.
>
> JZ: *(On the phone to his father)* So he said he can - I can call an attorney from the jail and he's not gonna talk to me anymore he's taking me to the jail. *(To the detective)* Are you - the attorney can call me? Like -
>
> MH: Right now? No, we're gonna take your phone back and that's gonna be the end of it.

(*Id.*, U.S. Ex. 1, Video at 18:18:30, 18:28:00-18:30:00; *id.*, Def. Ex. 3, CACU interview at pp. 20, 23-24 (emphasis added).) In the excerpts above, Detective Hedden repeatedly affects to believe that Mr. Zakhari had not already invoked his right to counsel; he treats the matter as nothing more than a hypothetical possibility, a turn of events that hadn't happened yet.

    In sum, the prosecution cannot carry its burden of proving that Mr. Zakhari validly waived his right to counsel after he initially invoked it: on the contrary, he did no more than "respond[] to further police-initiated custodial interrogation," and this sort of dialogue cannot, as a matter of law, supply a satisfactory waiver; and in any event, his subsequent communications with Detective Hedden cannot be construed to contain a "knowing and intelligent" waiver of the right to counsel.

### The interrogation of Mr. Zakhari must be excluded from the evidence at trial.

"An accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution establishes that he in fact knowingly and voluntarily waived his *Miranda* rights when he made the statement." *Moore*, 700 F.3d at 887 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)) (punctuation omitted); *see United States v. Potter*, 927 F.3d 446, 450 (6th Cir. 2019) (rule enforced through suppression of evidence).

The government has not made the necessary showing in our case. Mr. Zakhari accordingly urges the Court to exclude the entirety of his interrogation from the evidence at trial.

Respectfully submitted,

*Michael R. Mazzoli*
Scott C. Cox
Michael R. Mazzoli
Attorneys for Defendant Zakhari
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MazzoliCMLaw@aol.com

17

## CERTIFICATE OF SERVICE

On September 24, 2020, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*
Michael R. Mazzoli

18