UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                          Plaintiff

v.                                              Criminal Action No. 3:19-cr-00208-RGJ

JOSEPH SAMIR ZAKHARI                                              Defendant

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendant Joseph Zakhari moves to suppress and statements and challenges the constitutionality of a protective sweep of his apartment at the time of his arrest. [DE 32]. The Court held an evidentiary hearing. [DE 60]. Post-hearing briefs were filed. [DE 70, 73, 74]. This matter is now ripe. For the reasons below, the Court **GRANTS in part** and **DENIES in part** the Motion to Suppress. [DE 32].

## BACKGROUND

On October 8, 2019, Zakhari was arrested outside of his apartment building by a team of undercover law enforcement officers after exchanging sexually explicit messages over the social app, Kik, with an undercover persona managed by Detective Matt Hedden. [DE 70 at 525–27]. After his arrest, Zakhari requested to be taken into his apartment to care for his pet. The arresting officers obliged. [*Id.*; DE 60 at 442–43]. On entering Zakhari's residence, officers conducted a protective sweep to ensure there were no other people present in the apartment. [DE 60 at 443]. Once Zakhari's pet was adequately cared for, the officers transported Zakhari to the Crimes Against Children Unit (the "CACU") of the Louisville Metro Police Department to conduct an interrogation. [DE 60 at 424–25]. During both the search of Zakhari's apartment and his transportation to the CACU, officers did not ask Zakhari any questions about his alleged offenses

1

nor prompt any discussion. [DE 60 at 424; DE 60, United States Exhibit 1: Beginning of Protective Sweep; End of Protective Sweep, Transport to CACU].

At the CACU, Detective Hedden and Zakhari entered an interview room where Detective Hedden informed Zakhari of his *Miranda* rights. [DE 60 at 426]. Detective Hedden then began asking Zakhari for personal biographical data. When Detective Hedden asked for Zakhari's social security number, the following exchange occurred:

> Detective Hedden: [What is] your social security number?
>
> Zakhari: Can I call my dad?
>
> Hedden: I mean I don't – I don't have your phone and I can't give it to you right now.
>
> Zakhari: But you said I can stop anytime and call if I wanted to.
>
> Hedden: Yeah, well, is your dad an attorney?
>
> Zakhari: My sister is an attorney.
>
> Hedden: Do you want to call your sister?
>
> Zakhari: Yea–I mean, she– . . . [pause]
>
> Hedden: If you want to, yes, but that's going to be the end of us talking. And that's not my rule, that's just the way it is.
>
> Zakhari: I understand, I just don't know what more you want me to say. I made a huge mistake, if you want me to say that.

[DE 60, United States Exhibit 1: CACU Interview Room 1 ("Interview") at 18:00:33-01:11].

After the exchange, Detective Hedden continued to question Zakhari about the online communications Zakhari had with the undercover persona on Kik. [Interview at 18:01:48-08:00; 18:09:44-17:50]. Later in the interrogation, while discussing whether the Kik app was still on Zakhari's cell phone, counsel was discussed again in the following exchange:

> Detective Hedden: Is the – is the Kik app still there on your phone?

2

> Zakhari: It might be.
>
> Hedden: Were you using it today?
>
> Zakhari: Yeah, it's how we communicated today.
>
> Hedden: Okay, um – is – so there's messages still on there that might, kinda, prove some of what's going on here?
>
> Zakhari: Yeah.
>
> Hedden: Okay. What's the – is your phone locked in there?
>
> Zakhari: Sir, I would like my lawyer at this point. I don't think this is fair to, you know, put me through much more than this.

[*Id.* at 18:17:43-18:07].

Zakhari then asked Detective Hedden questions about the logistics of being taken to jail, when Zakhari would be able to contact his family, and if Zakhari could call his father for advice as to whether Zakhari should continue speaking with Detective Hedden. [*Id.* at 18:18:08-19:19]. Detective Hedden allowed Zakhari to use Zakhari's cell phone to call his father as a courtesy and, after handing Zakhari his phone, Detective Hedden began recording Zakhari's actions in case Zakhari attempted to manipulate his phone or wipe potential evidence. [*Id.* at 18:22:44-23:26; DE 60 at 430]. Zakhari objected to Detective Hedden recording his cell phone passcode. Detective Hedden explained that it was a courtesy phone call that he was not required to let Zakhari make, and that even with his cell phone password, Detective Hedden would need a warrant before searching the contents of the device. [Interview at 18:23:20-24:29]. Understanding that he was being recorded, Zakhari again asked for his phone, entered his passcode, called and spoke with his father. [*Id.* at 18:24:08-32:55]. After the phone call, Detective Hedden completed some paperwork while answering Zakhari's logistical questions about what would take place once they

3

left the CACU. [DE 60 at 56–57]. Finally, LMPD officers transported him to the Louisville Metro Department of Corrections. [DE 60 at 427].

The grand jury charged Zakhari with attempted online enticement of a minor and attempted transfer of obscene matter to a minor, [DE 9], and in a superseding indictment, with attempted production of child pornography. [DE 50].

## DISCUSSION

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriquez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendant's burden extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014).

**A. Arrest and Protective Sweep of Zakhari's Apartment.**

Zakhari identifies three "constitutional pressure points" in his motion: "first, the moment of arrest, . . . second, a sweep through the entirety of Mr. Zakhari's home, . . . and last, an interrogation in police custody." [DE 73 at 681-82]. Zakhari contends that "[t]he government's legal discussion of the first two of these stages . . . accurately presents the rules of law applicable to the investigators' conduct in those stages," and states that "the Court can measure the constitutionality of that conduct (and can well reach a different conclusion than the government urges) without the help of additional commentary" and thus includes no further argument for the suppression of either the arrest or sweep of Zakhari's apartment. [DE 73 at 682].

This Court ordered that any motion to suppress brought in this matter must "state with particularity the grounds for the motion, the relief sought, and the legal argument necessary to

4

support it. Further, a motion to suppress must expressly identify the exact statement(s) and/or evidence sought to be suppressed." [DE 16 at 42]. Zakhari has failed to state with sufficient particularity the grounds for his Motion to Suppress as it pertains to Zakhari's arrest or the protective sweep of his apartment. Accordingly, Zakhari's Motion to Suppress is DENIED with leave to renew as to Zakhari's arrest and the protective sweep of his apartment.

### B. Zakhari's Invocation of his Right to Counsel.

Defendant Zakhari moves to suppress the entirety of his interrogation by Detective Hedden on October 8, 2018, arguing that he invoked his right to counsel at the outset of the interrogation when he asked to call his dad and then his sister. [DE 73 at 682]. Zakhari additionally argues that he invoked his right to counsel again when he said "Sir, I would like my lawyer at this point," and the United States concedes that this statement was a clear invocation of Zakhari's right to counsel. [DE 73 at 694; DE 70 at 542].

"[I]ncriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her *Miranda* rights." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)). The burden is on the United States to prove that a defendant validly waived his *Miranda* rights. *See Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000). To invoke his right to counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *United States v. Scott*, 693 F.3d 715, 719 (6th Cir. 2012) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 922 (6th Cir. 2010)). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Id.* at 718

5

(quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). And "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459–62 (1994).

In *Perreault v. Smith*, the defendant exclaimed during his interrogation, "let's call the lawyer then 'cause I gave what I could," and the investigating officer explained that "getting a lawyer's not going to prevent [Perreault] from going to jail," and Perreault continued talking with the investigating officer thereafter. 874 F.3d 516, 519-20 (6th Cir. 2017). The Sixth Circuit held that it was reasonable for the investigating officer to interpret Perreault's statement as more akin to negotiating than to invoking his right to counsel. *Id.* at 520. Similarly, in *United States v. Delaney*, the Sixth Circuit held that a defendant's purported invocation of his right to counsel by asking, "I think I should talk to a lawyer, what do you think?" was ambiguous because it did not "clearly indicate[ ] that Delaney would only deal with the police with counsel present." 443 Fed. Appx. 122, 130 (6th Cir. 2011).

1. "Can I call my dad?"

The first point at which Zakhari contends that he invoked his right to counsel was in the beginning of his interrogation shortly after he asked Detective Hedden "Can I call my dad?" and Detective Hedden asked whether Zakhari's father was an attorney. [DE 73 at 689]. Zakhari responded that his sister was an attorney, and Detective Hedden asked Zakhari if he would like to call his sister; Zakhari began to answer then quickly trailed off before pausing to sigh. [Interview at 18:00:33-01:11]. During Zakhari's pause, Detective Hedden reiterated that Zakhari could speak with an attorney if he wished and that doing so would terminate their discussion. [*Id.*; DE 60 at

456]. Zakhari contends that he clearly invoked his right to counsel during this exchange because "[t]here was no ambiguity in Mr. Zakhari's request." [DE 73 at 10]. The Court does not find Zakhari's response to be a clear and unambiguous invocation of his right to counsel.

When Detective Hedden asked Zakhari if he would like to call his sister, Zakhari's response was equivocal; while he began answering, he looked away and quickly stammered through the beginning of an affirmative answer, "yea—," and a different thought, "I mean she—," before sighing and remaining silent for a few seconds until Detective Hedden began speaking again. [Interview at 18:00:47-58]. As the United States argues, "Zakhari's requests to talk with his sister and father more closely resemble[d] an attempt to speak with family than a serious request for counsel." [DE 70 at 541]. It is unlikely that a reasonable police officer would interpret Zakhari's indecisive utterances to be a clear invocation of his right to counsel. Detective Hedden then clarified what the implications would be if Zakhari invoked his right to counsel, and in response, Zakhari chose to continue answering Detective Hedden's questioning. [Interview at 18:00:56-01:49]. Accordingly, Zakhari's Motion to Suppress is DENIED as it pertains to statements following this exchange.

  2. <u>"Sir, I would like my lawyer at this point."</u>

The second point at which Zakhari contends that he invoked his right to counsel occurred about 18 minutes later in Zakhari's interrogation. [DE 73 at 694]. In response to Detective Hedden's questions about what potential evidence might be on Zakhari's phone and how to access it, Zakhari stated, "Sir, I would like my lawyer at this point. I don't think this is fair to – you know – put me through much more than this." [Interview at 18:17:59-18:06; DE 73 at 14]. The United States concedes that this statement "clearly invoked [Zakhari's] right to consult with an attorney." [DE 70 at 542]. The Court agrees, and thus, Zakhari's Motion to Suppress [DE 32] is GRANTED

7

as to the portion of the interrogation after Zakhari invoked his right to counsel (at 18:18:06 on the Interview video [DE 60, United States Exhibit 1: Interview] time counter).

### C. Detective Hedden's Recording of Zakhari's iPhone Passcode.

Zakhari contends that because he properly invoked his right to counsel, all of his subsequent statements must be suppressed including his "surrendering the passcode for his cellphone," [DE 73 at 649], which was relied on in part to secure a search warrant for the contents of Zakhari's phone. [DE 32 at 99]. The Court finds that Zakhari's operation of his cell phone was not in response to police interrogation and is therefore admissible.

In *Edwards v. Arizona*, the Supreme Court held that "an accused, . . . having expressed his desire to deal with police only through counsel, is not subject to *further interrogation* by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477 at 484-85 (1981) (emphasis added). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning," but extends to any communication that functions as interrogation, including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *R.I. v. Innis*, 446 U.S. 291 at 301 (1980). This definition of interrogation places focus "primarily on the perceptions of the subject, rather than the intent of the police." *Id.*

In *Arizona v. Mauro*, after a suspect, Mauro, had properly invoked his right to counsel, an interrogating detective permitted Mauro to speak with his wife in satisfaction of the wife's continued demands to do so. 481 U.S. 520 at 528 (1987). The detective remained present while Mauro spoke with his wife, and he recorded their discussion in which Mauro made incriminating statements. *Id.* The Supreme Court held that the detective did not functionally interrogate Mauro

by permitting him to speak with his wife, even though the detective "knew it was 'possible' that Mauro might make incriminating statements if he saw his wife," because there was "no evidence that the officers sent [Mauro's wife] in to see her husband for the purpose of eliciting incriminating statements," and because "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Id.* at 524, 527, 529. Further, the detective's presence during, and recording of, the spouses' conversation was proper because the detective's testimony "indicated a number of legitimate reasons -- not related to securing incriminating statements -- for having a police officer present."[1] *Id.* at 528. Ultimately, the Supreme Court held that the police did not violate Mauro's Fifth Amendment rights by allowing him to speak with his wife in the presence of a police officer after Mauro had properly invoked his right to counsel. *See id.*

In this matter, Zakhari's operation of his cell phone and phone call with his father were not in response to interrogation by the police. After invoking his right to counsel, Zakhari repeatedly asked Detective Hedden how and when he could get in touch with his father. [Interview 18:18:08-19:16]. In response to Zakhari's repeated questions, Detective Hedden offered to allow Zakhari to speak with his father on Detective Hedden's phone but because Zakhari did not remember his father's phone number, Zakhari asked if they could use his phone to make the call. [*Id.* at 18:19:32-44]. The two then agreed that Detective Hedden would allow Zakhari to make the phone call on Zakhari's phone under Detective Hedden's supervision. [Interview at 18:19:31-48]. Like the detective in *Arizona v. Mauro*, Detective Hedden did not provoke or persuade Zakhari to speak with his father, but allowed Zakhari to speak with his father at his request. Detective Hedden's recording of Zakhari's use of his phone was also permissible because Detective Hedden cited to

---

[1] The police cited to fears for Mauro's wife's "safety, and they were also concerned about security . . . and whether some escape attempt might have been made, or whether there might have been an attempt to smuggle in a weapon. They really had no idea what to expect along those lines." *Ariz. v. Mauro*, 481 U.S. 520 at 523-24 (1987).

9

legitimate concerns that Zakhari could manipulate his cell phone – and thus the potential evidence stored on it – if he were permitted to use it unsupervised.[2] For these reasons, Zakhari's Motion to Suppress is DENIED as to Zakhari's use of his cell phone and phone conversation with his father (from 18:24:09-32:55 on the Interview video [DE 60, United States Exhibit 1: Interview] time counter).

## CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED that** Zakhari's Motion to Suppress Evidence [DE 32] is **GRANTED in part** and **DENIED in part** as set forth above. This matter is set for a status conference on **November 17, 2020 at 11:30 a.m.** at the Gene Snyder United States Courthouse before the Honorable Rebecca Grady Jennings, United States District Judge.

Cc: Counsel of record

Rebecca Grady Jennings, District Judge
United States District Court

October 21, 2020

---

[2] Detective Hedden stated that his "concern was that Mr. Zakhari could potentially wipe out the phone – it was an iPhone, so they're not terribly difficult to wipe the data from the device. . . . [and since] anything that would happen to that device would fall back ultimately to [Detective Hedden]." [DE 60 at 25].